UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SHAMIEKA PIERRE, <br><br> Plaintiff, <br><br> v. <br><br> WELLPATH, LLC, MARLIN GUSMAN, and PAUL GRILLIER, <br><br> Defendants. | Case No. 21-1043 |

## COMPLAINT

Plaintiff Shamieka Pierre brings this this suit against her employer, Wellpath, LLC, Orleans Parish Sheriff Marlin Gusman, and Orleans Parish Sheriff Deputy Paul Grillier, alleging violations of Title VII of the Civil Rights Act, the Louisiana Employment Discrimination Act, and state law torts.

### I.     INTRODUCTION

1.      Plaintiff Shamieka Pierre worked at the Orleans Justice Center as a medical assistant.

2.      While employed with Wellpath, LLC and the Orleans Parish Sheriff's Office, Ms. Pierre was directed by Defendant Grillier to enter an inmate housing pod to draw blood from an inmate. She was then locked into the pod and sexually assaulted by a group of inmates while Defendant Grillier remained nearby and did nothing.

3.      When Ms. Pierre reported the incident to her superiors, both with Wellpath, LLC and with the Sheriff's Office, Ms. Pierre was met with open hostility through accusatory questioning and false accusations about her part in the assault.

1

4. Defendant Wellpath, LLC further retaliated against Ms. Pierre when they prevented her from returning to work for two weeks without pay.

5. Ms. Pierre now seeks to enforce her rights through this lawsuit.

6. Ms. Pierre brings this complaint for violation of her rights to be free from sexual assault and battery, sexual harassment, discrimination on the basis of her sex, and retaliation. Ms. Pierre also raises state law claims of discrimination, retaliation, false imprisonment, and negligence.

## II. JURISDICTION AND VENUE

7. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act and other statutes. Jurisdiction is based on 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights). Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear claims arising under state law.

8. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiff's claims arose in the Eastern District of Louisiana, and because Defendants reside in the District.

9. Ms. Pierre has exhausted all administrative remedies by filing a charge with the Equal Employment Opportunity Commission on December 8, 2020. The EEOC issued a right to sue letter on March 4, 2021.

## III. PARTIES

*Plaintiff*

10. <u>Plaintiff Shamieka Pierre</u> is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. She works at the Orleans Parish Justice Center (OJC) and

Wellpath, LLC, where she experienced sexual harassment, discrimination on the basis of her sex, and retaliation.

*Defendants*

11.     <u>Defendant Orleans Parish Sheriff Marlin Gusman</u> is an adult citizen of the State of Louisiana domiciled in the Eastern District of Louisiana. Defendant Gusman was, at all times relevant to this Complaint, the Sheriff of Orleans Parish Sheriff's Office, operating in the Eastern District of Louisiana. He is sued in his individual and official capacities. Sheriff Gusman controlled Defendant Deputy Paul Grillier in this case and was responsible for the hiring, training, and discipline of the deputies. At all times relevant to this Complaint, Sheriff Gusman had more than 20 employees.

12.     <u>Defendant Deputy Paul Grillier</u> is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. At all times relevant to this Complaint, Defendant Grillier was a Deputy in the Orleans Parish Sheriff's Office. He is sued in his individual and official capacities.

13.     <u>Defendant Wellpath, LLC</u> is a limited liability company domiciled in Wilmington, DE, with its principal place of business and mailing address in Nashville, TN. At all times relevant to this Complaint, Wellpath, LLC conducted business at the Orleans Justice Center in the Eastern District of Louisiana and had more than 20 employees.

14.     Except as otherwise indicated, each defendant is a joint tortfeasor with every other defendant under Louisiana Civil Code Art. 2324.

**IV.     STATEMENT OF FACTS**

15.     Ms. Pierre is a medical assistant employed by Defendants Wellpath, LLC and Sheriff Gusman.

16. Ms. Pierre was hired by Wellpath, LLC in July of 2019 specifically to work as a medical assistant for the Orleans Parish Sheriff Gusman in at the Orleans Justice Center (OJC), which is the pre-trial detention center for Orleans Parish criminal defendants.

17. On July 7, 2020, Ms. Pierre was working as a medical assistant in OJC.

18. Ms. Pierre was not a full-time phlebotomist, however she was asked frequently to take blood and other labs from inmates by the Director of Nursing, Tonyell Jones. Nurse Jones asked Ms. Pierre to draw blood from inmates because the jail was short-staffed.

19. It is common knowledge that the jail is short-staffed with medical professionals and medical assistants like Ms. Pierre are frequently asked to do tasks outside their job description.

20. On July 7, 2020, Ms. Pierre was asked to draw blood from an inmate on housing pod 4B.

21. When Ms. Pierre arrived at pod 4B, she was met by Defendant Deputy Paul Grillier, who was staffing the housing pod.

22. Ms. Pierre is required to follow the instructions of OPSO deputies when she goes on the jail tiers or pods. She does not have the authority to be on a tier or pod without a deputy. When she enters a tier or pod, a deputy must be present at all times.

23. While standing in the doorway of the pod, Ms. Pierre asked Defendant Grillier to get the inmate who needed blood work. It is the discretion of the pod deputy whether to retrieve inmates for medical care.

24. Deputy Grillier complied with Ms. Pierre's request and retrieved the inmate she asked for.

25. When the inmate came to the door, he was shirtless, and Ms. Pierre asked him to put a shirt on.

26. When the inmate returned, he invited Ms. Pierre to come onto the pod. This is not protocol and Ms. Pierre said no.

27. Defendant Grillier then asked Ms. Pierre what she needed to do. She told Defendant Grillier that she needed to draw blood from the inmate.

28. Defendant Grillier told Ms. Pierre to go in the pod and to draw the inmate's blood in the visitation booth.

29. It is against OPSO protocol is for medical assistants to draw blood on the pod.

30. Defendant Grillier directed Ms. Pierre to go on the pod to draw blood, against OPSO protocol, and assured her she would be safe when he told her "I got you, I'll watch you."

31. The visitation booth, where Defendant Grillier instructed Ms. Pierre to go, is immediately to the right after you walk on the pod.

32. Ms. Pierre entered the pod at Defendant Grillier's direction, and the door was closed behind her, locking her in.

33. Ms. Pierre would not have entered the pod if Grillier had not directed to her, and if he had not promised to watch her.

34. While Ms. Pierre prepared her instruments to draw the inmate's blood, she and the inmate began talking.

35. Then, Ms. Pierre heard several voices, as if there were multiple inmates trying to talk to her. This caused Ms. Pierre to look up and look around, since she knew a deputy would not allow several inmates to congregate around her.

36. As Ms. Pierre looked up, she was surrounded by three inmates, all with their pants down, fully exposed and masturbating.

37. Ms. Pierre also realized Defendant Grillier was nowhere to be found, a violation of OPSO protocol.

38. Ms. Pierre then stood up, told the inmates to move and left the visitation booth.

39. Ms. Pierre had to push past all the inmates to remove herself from the area.

40. As she was walking to the door, startled, and fearing for her safety, Ms. Pierre realized she left the medical cart and tourniquet behind.

41. When she went back to get the cart, Ms. Pierre looked up and called for Defendant Grillier for help. When she looked across the pod, Ms. Pierre saw Defendant Grillier watching television.

42. Ms. Pierre had to push through the inmates again, alone and fearing for her safety, to retrieve the cart.

43. As Ms. Pierre pushed her way through the inmates, one of the inmates grabbed her buttocks while the others groped other parts of her body and pulled on her clothes.

44. As Ms. Pierre was enduring this assault, Defendant Grillier continued to watch television and he did not intervene or attempt to protect Ms. Pierre.

45. Ms. Pierre eventually retrieved the medical cart and made it to the pod door where she hurriedly pressed a call button to be let out. Central Security eventually opened the door.

46. When Ms. Pierre exited the pod, she was immediately met by OPSO Sergeant McGill, who told her he was informed about the assault by Central Security.

47. Sgt. McGill interviewed Ms. Pierre after the assault.

48. Sgt. McGill told Ms. Pierre he was angry after watching the surveillance video of the assault because it was clear Defendant Grillier never intended to watch her. He informed Ms.

Pierre that Defendant Grillier walked away as soon as she began to prepare to take the inmate's blood.

49. Sgt. McGill asked Ms. Pierre to write a statement.

50. Nurse Jones, the Wellpath, LLC Director of Nursing, came to speak with Ms. Pierre about 30 minutes after the incident. During this conversation, she told Ms. Pierre she was sorry about what happened, that she would do whatever she could to handle the situation. She also told Ms. Pierre to take some time off.

51. Several Investigation Services Bureau (ISB) Agents interviewed Ms. Pierre about the assault.

52. After Ms. Pierre's recorded interview with ISB Agent Collier, a female investigator made several accusatory comments to Ms. Pierre off the record including: "why did you put yourself in that situation," "why didn't you just leave," and "you have to be smarter than that."

53. Several days after the assault, after Ms. Pierre was told to take unpaid sick leave, Ms. Pierre contacted Nurse Jones to ask if she could return to work.

54. Nurse Jones informed Ms. Pierre that they were waiting on ISB to approve Ms. Pierre's return.

55. During the two weeks when Ms. Pierre was waiting to be put on the work schedule, she was not paid.

56. Eventually, Ms. Pierre contacted Nurse Jones' supervisor and Human Services Administrator (HSA) to ask whether ISB had approved her return to work. The HSA informed Ms. Pierre that they were not waiting for ISB approval and she could come back, directly contradicting what Nurse Jones was telling Ms. Pierre.

57. Once Ms. Pierre returned to work, Nurse Jones again told her she had to take blood samples on the pods. Ms. Pierre told Nurse Jones several times that she did not feel comfortable because of the assault and refused to go on the pods.

58. Nurse Jones called Ms. Pierre for a meeting, in which she told Ms. Pierre she had to start doing blood work because they were getting pressure from "higher-ups" for not keeping up with the demand of labs.

59. Nurse Jones suggested Wellpath would provide counseling services, however after several attempts to set up an appointment with no response, Ms. Pierre has not received any counseling.

60. After Ms. Pierre returned to work, she was told by Nurse Jones "not to listen to the rumors" going around about the assault. After further inquiry, Ms. Pierre learned that OPSO deputies and Wellpath staff believed she encouraged the assault by the inmates and that she enjoyed the attention.

61. Ms. Pierre has suffered great emotional distress, anxiety and lack of sleep due to the assault and following harassment. Ms. Pierre still experiences flashbacks when she is in OJC, which has creates even more anxiety. Ms. Pierre was humiliated by the assault and was further humiliated when she learned about the rumors being spread by other employees.

62. Wellpath, LLC and OPSO deputies have continued to fail to protect Ms. Pierre.

63. Ms. Pierre has specifically asked to not be placed on the pod with one of the inmates who was involved in the assault. This inmate is also known in the jail for exposing himself and acting inappropriately with jail staff.

64. A few months ago, this specific inmate approached Ms. Pierre and yelled at her to "drop the charges." Eventually a deputy had to intervene and restrain the inmate. No one informed Ms. Pierre that he was on the tier where she was assigned to work.

65. On March 4, 2021, the EEOC issued Ms. Pierre a Right to Sue letter.

66. In short, Ms. Pierre endured incessant sexual harassment and harassment related to this sexual assault from her superiors and co-workers, and the Wellpath, LLC and Ms. Pierre's superiors retaliated against Ms. Pierre by escalating the harassment through accusatory comments and rumors and through keeping her off the work schedule without pay.

67. As a result, Ms. Pierre suffered a loss of wages, as well as damages related to the emotional and physical toll of the enduring discrimination and battery.

## V.   CAUSES OF ACTION

### *Count One* – **Violation of Title VII of the Civil Rights Act**
*(Wellpath LLC)*

68. Plaintiff realleges and incorporates each and every foregoing paragraph.

69. Title VII of the Civil Rights Act bars gender discrimination in the form of workplace sexual harassment. Civil Rights Act of 1964, § 701 *et seq.*, as amended, 42 U.S.C.A. § 2000e *et seq*.

70. A hostile work environment resulting from sexual harassment is a kind of gender discrimination that violates Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

71. A prima facie case of hostile work environment requires: (a) the employee belongs to a protected group, (b) the employee was subject to unwelcome sexual harassment, (c) the harassment was based on sex, (d) the harassment affected a "term, condition, or privilege of employment," and (e) *respondeat superior* (*i.e.*, the employer knew or should have known of the

harassment and failed to take remedial action). *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986).

72. For behavior to be harassment, the conduct must be unwelcome "in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." EEOC Compl. Man. (CCH) P3114 (Mar. 19, 1990) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982).

73. Harassment affects a "term, condition, or privilege of employment" when it is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 401 (5th Cir. 2013), quoting *Harvill v. Westward Commc'ns, L.L.C.,* 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L.Ed. 2d 49 (1986)). In *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, the employee had a viable hostile work environment due to the "frequency of unwanted attention," where her harasser repeatedly called her, asked to "snuggle," and repeatedly asked to get coffee after work. *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.,* 512 F.3d 157, 164 (5th Cir. 2007). The Fifth Circuit found that "[g]iven this pervasiveness, the level of severity necessary to establish an altered work environment is diminished." *Id*.

74. An employer may take advantage of an affirmative defense against sexual harassment if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998).

75. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.* at 2279. This is *quid pro quo* harassment, and results in strict liability for the employer. *See* EEOC Enforcement Guidance, "Vicarious Employer Responsibility for Unlawful Harassment by Supervisors" (June 18, 1999).

76. Title VII, specifically 42 U.S.C. § 2000e-3 makes it unlawful for an employer to retaliate against an employee who has opposed an unlawful employment practice, or a practice they reasonably believed to be unlawful.

77. Here, Ms. Pierre was the subject of severe unwanted sexual harassment by inmates in the presence of OPSO deputies who knew about the problem, but who did nothing to stop it.

78. Wellpath was also on notice of a pattern of sexual assaults by inmates on female medical personnel.

79. In 2018, Wellpath's predecessor, Correct Care Solutions, LLC, was sued for, among other things, a pattern by which "nurses were being physically and psychologically sexually assaulted on numerous occasions by Inmates at OPP. Plaintiff's complaints of these incidents to defendant CCS' DIRECTOR OF NURSING and OPP's staff members were ignored and the inmates continued." *Henderson v. Gusman*, Orleans Civil District Court No. 2018-4277.

80. Despite being on notice of inmate-on-medical-staff sexual assault and harassment, Wellpath did not take the necessary steps to provide a safe workplace to its female workers.

81. Ms. Pierre was also subject to pervasive sexual harassment by OPSO deputies and Wellpath staff who perpetuated rumors about the sexual assault, stating Ms. Pierre encouraged and enjoyed the assault. Ms. Pierre's supervisor knew about the harassment and did nothing to stop it.

82. Ms. Pierre did not welcome this behavior from the inmates, her coworkers and

superiors.

83. The hostile work environment was so severe that it resulted in criminal charges, the termination of Defendant Grillier, and caused Ms. Pierre to take time off work. The further harassment by coworkers spreading false accusations about Ms. Pierre was pervasive and ongoing.

84. Ms. Pierre was in a protected class, as a woman.

85. The behavior of the inmates in front of OPSO deputies was "criminal conduct of the most serious nature" and is clearly sufficient to state a claim for sexual harassment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986).

86. The behavior of the inmates and Ms. Pierre's coworkers and superiors was offensive, severe, unwelcome, and pervasive. The pervasiveness of the conduct created a hostile work environment that was severe enough to affect the terms, conditions, and privileges of employment.

87. Defendants, through pervasive sexual harassment, created a hostile work environment for Ms. Pierre.

88. When Defendant Wellpath, LLC forced Ms. Pierre to take unpaid leave, they committed retaliation.

89. Defendants' conduct was intentional and done with malice or with reckless indifference to the federally-protected rights of Ms. Pierre.

90. Defendants' actions have caused Ms. Pierre to suffer mental, emotional, physical, and psychological harm.

91. Ms. Pierre suffered a loss of present wages and employment benefits as a result of Defendants' unlawful conduct.

92. On December 8, 2020, Ms. Pierre filed Charges of Discrimination with the Equal Employment Opportunity Commission under No. 461-2021-00969 against Defendant Wellpath, LLC.

93. On March 4, 2021, Ms. Pierre was issued a Right to Sue Letter.

### *Count Two* – **Retaliation in Violation of Title VII of the Civil Rights Act**
*(Wellpath, LLC)*

94. Plaintiff realleges and incorporates each and every foregoing paragraph.

95. Title VII of the Civil Rights Act also protects employees who suffer an adverse employment action because they engaged in a protected activity. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999).

96. Many activities are considered "protected" under Title VII, including but not limited to reporting or opposing harassment. *Carter v. Town of Benton*, 827 F.Supp.2d 700 (W.D. La. 2010).

97. Here, Ms. Pierre reported harassment to Defendants, who responded by taking her off the work schedule for two weeks without pay and escalating the hostilities and sexual harassment by allowing false accusations to be spread about Ms. Pierre's assault.

98. Ms. Pierre reasonably believed that the practices she complained of were unlawful.

99. The work restrictions of Ms. Pierre's employment would not have been implemented but for her reporting the harassment, as it occurred directly in response to her reporting.

### *Count Three* - **Louisiana Employment Discrimination Law**
*(Wellpath, LLC)*

100. Plaintiff realleges and incorporate each and every foregoing paragraph.

101. La. R.S. 23:332(A)(1) makes it unlawful to discriminate against any individual in

employment based on their sex.

102.  The Louisiana anti-discrimination law shares a similar scope and applicability to its federal counterparts plead herein. *White v. Golden*, 982 So.2d 234, 243 (La. App. 2008).

103.  By the conduct alleged herein, Defendants subjected Ms. Pierre to gender discrimination in the form of hostile workplace sexual harassment and retaliation in violation of the Louisiana Employment Discrimination Law.

104.  When Defendant Wellpath, LLC would not allow Ms. Pierre to come back to work for two weeks, they unlawfully retaliated under the Louisiana Employment Discrimination Law.

## *Count Four* – **Negligence by Failing to Protect**
*(All Defendants)*

105.  Plaintiff incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

106.  Defendant OPSO Sheriff Gusman, while acting in his official capacity as Orleans Parish Sheriff and while engaged in the business of housing and care of inmates at OJC, had a duty to exercise reasonable care to protect its agents, employees and staff personnel, including Ms. Pierre.

107.  Defendant Grillier was responsible for the custody and care of inmates and responsible to ensure the welfare and safety of everyone on the jail tier, including Ms. Pierre, and to protect them from harm such as sexual assault.

108.  Defendant Wellpath, LLC had a duty to exercise reasonable care to protect Ms. Pierre while she was performing her employment duties at OJC.

109.  Defendants breached their duty of care when Ms. Pierre was told to draw blood from an inmate inside the pod where she was exposed to a substantial risk of harm.

110. Defendants were aware that their conduct would result in a substantial risk of harm to employees like Ms. Pierre because this conduct is prohibited.

111. Defendants breached their duty of care to Ms. Pierre when Defendant Grillier walked away from Ms. Pierre, allowing other inmates to sexually assault her.

112. Ms. Pierre would not have gone on to the housing pod to draw blood if Defendant Grillier had not encouraged her to do so and assured her he would protect her.

113. The lack of protection by Defendants caused the harm and injury to Ms. Pierre.

114. Ms. Pierre was injured as a result of the conduct of the Defendants.

### *Count Five* – **Negligence by Failing to Train and Supervise**
*(Sheriff Gusman)*

115. Plaintiff incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

116. At all times material, Defendant OPSO Sheriff Gusman, while acting in his official capacity as Orleans Parish Sheriff and while engaged in the business of housing and care of inmates at OJC, had a duty to exercise reasonable care in the training, supervising, monitoring and controlling its agents, employees and staff personnel, including Defendant Deputy Grillier, who were responsible for the custody and care of inmates, and who were responsible to ensure the welfare and safety of its employees, including Plaintiff, and to protect them from harm such as sexual assault.

117. As a direct and proximate result of Defendant Gusman's negligent training and supervision of Defendant Grillier, Ms. Pierre was brought onto a housing pod of OJC and sexually assaulted, suffered extreme emotional, mental and psychological injury. These losses and injuries are continuing and permanent in nature and will require ongoing treatment and counseling throughout the Plaintiff's lifetime.

### *Count Six* – **False Imprisonment**
### *(Defendant Grillier)*

118. Louisiana R.S. § 14:46 provides that: "False imprisonment is the intentional confinement or detention of another, without his consent and without proper legal authority."

119. The "non-consensual confinement of a person through deception or trickery may constitute false imprisonment even when the offender does not use, attempt to use or threaten to use force." *U.S. v. Stapleton*, 440 F.3d 700 (5th Cir. 2006).

120. Here, Defendant Grillier deceived Ms. Pierre by promising that he would watch and protect her while she was in the pod.

121. This was false; Defendant Grillier did not do so. He locked Ms. Pierre into the pod.

122. Ms. Pierre would not have entered the pod but for Defendant Grillier's deception.

123. Therefore, Defendant Grillier falsely imprisoned Ms. Pierre.

### *Count Seven* – **Respondeat Superior**
### *(Sheriff Gusman)*

124. Plaintiff incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

125. At all times material, Defendant Grillier was on the premises of OJC and privileged to be on the premises by virtue of his employment with OPSO and was responsible for the safety of the Plaintiff by virtue of the authority conferred upon him by his employment with OPSO.

126. While staffing housing pod 4b of OJC, Defendant Grillier was an employee, member, and agent of Defendant Gusman within the scope of his employment.

127. Defendant Gusman is therefore liable as principals for all torts committed by his agents, in this case Defendant Grillier.

### **RELIEF REQUESTED**

16

128. Wherefore Plaintiff prays for judgment against Defendants as follows:

    (a) For a judgment against Defendants for all asserted causes of action;

    (b) For a judgment awarding compensatory damages;

    (c) For a judgment awarding special and punitive damages;

    (d) For a judgment awarding Plaintiff her costs and attorney's fees;

    (e) For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law; and

    (f) For all other and further relief as may be necessary and appropriate.

129. Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this Court may seem equitable.

130. Plaintiff reserves the right to notice of defect to this pleading and reserves the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully Submitted:

**MOST & ASSOCIATES**

*/s/ Caroline Gabriel*
**CAROLINE GABRIEL (La. Bar. No. 38224)**
**WILLIAM MOST (La. Bar No. 36914)**
**HOPE PHELPS (La. Bar No. 37259)**
**DAVID LANSER (La. Bar No. 37764)**
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170

Tel: 985-441-9355
Email: caroline.gabriel.ma@gmail.com

***Counsel for Plaintiff, Shamieka Pierre***
***Plaintiff will request waiver of service; no summons needed at this time.***